**SANDRA BRINKMAN and Mark Brinkman, Appellants–Plaintiffs,**

**v.**

**Anne P. BUETER, M.D., James F. Dupler, M.D., and Woman's Health Partnership, P.C., Appellees–Defendants.**

**No. 29A02–0510–CV–980.**

Court of Appeals of Indiana.

Nov. 20, 2006.

Rex E. Baker, Caroline A. Gilchrist, Baker & Gilchrist, Avon, IN, Attorneys for Appellants.

Mary H. Watts, Nana Quay–Smith, Kelly R. Eskew, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Plaintiffs, Sandra and Mark Brinkman (collectively, the Brinkmans), appeal the trial court's grant of summary judgment in favor of Appellees–Defendants, Anne P. Bueter, M.D. (Dr. Bueter), James F. Dupler, M.D. (Dr. Dupler), and Women's Health Partnership (WHP) (collectively, the Physicians).

We affirm in part, reverse in part, and remand.

### ISSUES

The Brinkmans raise three issues on appeal, which we restate as:

(1) Whether the two-year statute of limitations for actions brought under the Medical Malpractice Act violates the Indiana constitution where the Brinkmans neither knew, nor could have known in the exercise of reasonable diligence, that they possessed a claim for medical malpractice; and

(2) Whether the trial court erred in concluding that no genuine issue of material fact existed as to the question of Dr. Dupler's standard of care in treating Sandra Brinkman.

On cross-appeal, the Physicians raise the following issue:

Whether the statute of limitations under the Medical Malpractice Act bars the Brinkmans' claim that Dr. Bueter negligently counseled them to not have any more children.

### FACTS AND PROCEDURAL HISTORY[1]

In May of 1994, Sandra Brinkman (Sandra) learned she was pregnant and sought prenatal, obstetrical, and postnatal care from the Physicians. Dr. Bueter determined that Sandra was due to deliver on or about February 2, 1995. While Sandra's primary obstetrician was Dr. Bueter, other physicians within WHP saw Sandra throughout her pregnancy. During a prenatal appointment on January 19, 1995, Dr. Dupler evaluated Sandra and noted that her blood pressure was elevated, her weight had increased, and her urine was positive for two-plus protein. As a result of his evaluation, Dr. Dupler requested Sandra return for another office visit in three days. Dr. Dupler did not record on Sandra's chart any suspicion he may have had that she was suffering from preeclampsia.[2]

---

1. In our recitation of the facts and procedural history, we rely in part on our earlier opinion, *Bueter v. Brinkman*, 776 N.E.2d 910, 911–12 (Ind.Ct.App.2002).

2. Preeclampsia is the development of elevated blood pressure and protein in the urine (proteinuria) after the 20th week of pregnancy. http://www.nlm.nih.gov/medlineplus/ency/article/000898.htm. The condition is addition-

On Sunday, January 22, 1995, Sandra was admitted to St. Vincent Hospital in Carmel, Indiana with complaints of a severe headache that had persisted for a few days. Sandra additionally complained of gastric pain and vomiting. Upon admission, Dr. Dupler evaluated Sandra, again noting that her blood pressure was high and that her urine contained trace protein, but also charting that he found no signs or symptoms of preeclampsia. Due to her continuing and severe headache, Dr. Dupler ordered a neurological exam of Sandra, which was performed by neurologist, Wesley Wong, M.D. (Dr. Wong). Dr. Wong's evaluation revealed no neurological explanation for Sandra's headache or other symptoms.

On January 25, 1995, while still hospitalized, Sandra went into labor. In the early morning hours of January 26, Sandra delivered a baby girl. Following delivery, Sandra experienced some relief of her previous symptoms, but her blood pressure remained elevated. Due to her elevated blood pressure, Dr. Wong recommended that Sandra remain in the hospital until it was stabilized; nonetheless, Dr. Dupler released Sandra on the afternoon of January 27, 1995, with instructions to call WHP if her headache returned.

On January 28 and 29, 1995, Sandra's husband, Mark Brinkman (Mark), called WHP and reported that Sandra had a severe headache. On January 30, 1995, Sandra called WHP complaining of a severe headache, as well as vomiting. However, because Sandra was now post-delivery and did not require obstetrical care, WHP referred her to a family physician, Steven Lang, M.D. (Dr. Lang), to treat her headache and vomiting. During an office visit on the same date, Dr. Lang treated Sandra's pain and nausea with medication, and sent her home. Later that afternoon, while resting in bed, Sandra had a grand mal seizure, witnessed by Mark. Shortly thereafter, she was taken by an ambulance to the emergency room at St. Vincent Hospital in Carmel, Indiana where she experienced another grand mal seizure. She was then transferred to St. Vincent Hospital in Indianapolis, and admitted with a diagnosis of toxic eclampsia.[3] She remained in the hospital under treatment for eclampsia until February 4, 1995.

On March 10, 1995, Sandra, along with Mark, visited Dr. Bueter for a post-partum check-up. At this appointment, Dr. Bueter advised the Brinkmans to not have any more children because Sandra's diagnosis with eclampsia put her in a high-risk category for future complications during pregnancy. Further, the Brinkmans contend that Dr. Bueter stated she would terminate her physician-patient relationship with Sandra if Sandra did not choose a sterilization procedure to prevent another pregnancy. On the other hand, Dr. Bueter alleges she remembers little about the details of her discussion with the Brinkmans that day, but that it is her practice to discuss sterilization with any patient who

---

ally signified by documented weight gain, swelling in the upper body, and systemic problems such as headache, blurred vision and abdominal pain. *Id.;* http://www.nichd. gov/health/topics/Preeclampsia_and_ Eclampsia.cfm. The only way to cure preeclampsia is to deliver the baby. http://www. nlm.nih.gov/medlineplus/ency/article/000898. htm. However, if delivery would be very premature, the disease may be managed by bed rest, close monitoring, and delivery as soon as the fetus has a good chance of surviving outside the womb. *Id.* Preeclampsia is also referred to as "toxemia" or "pregnancy-induced hypertension." *Id.*

3. Eclampsia is a more severe form of preeclampsia that can cause seizures and coma in the mother. http://www.nichd.gov/health/ topics/Preeclampsia_and_Eclampsia.cfm.

has had two or more children.[4]

As a result of Dr. Bueter's advice, the Brinkmans decided to not have any more children; however, for financial reasons, the Brinkmans opted not to undergo the sterilization procedure. The Brinkmans did not contact Dr. Bueter or WHP again until January of 2000, when Sandra suspected she might be pregnant despite efforts to prevent pregnancy. As Dr. Bueter was no longer with WHP, WHP advised Sandra to seek a physician elsewhere. Consequently, Sandra contacted Dr. Lang, who confirmed her pregnancy and referred her to Dawn Zimmer, M.D. (Dr. Zimmer), an obstetrician providing high-risk obstetrical care.

On January 31, 2000, the Brinkmans met with Dr. Zimmer, and were informed that a review of Sandra's previous medical records showed she had symptoms of preeclampsia prior to the birth of her daughter in 1995. Further, Dr. Zimmer informed the Brinkmans that if Sandra had received proper care for preeclampsia, she would not have progressed into toxic eclampsia. In addition, Dr. Zimmer explained to the Brinkmans that (1) the risk of preeclampsia does not increase in subsequent pregnancies with the same father, (2) preeclampsia does not always recur in subsequent pregnancies, and (3) if preeclampsia recurs, it can be treated and toxic eclampsia can be prevented. Therefore, because preeclampsia can be managed, Dr. Zimmer neither agreed with Dr. Bueter's advice that Sandra should not have any more children, nor that she should be sterilized to prevent subsequent pregnancies.

On December 7, 2000, as a result of the information gained through Dr. Zimmer, the Brinkmans filed a Proposed Complaint against the Physicians with the Indiana Department of Insurance. On February 28, 2001, the Physicians filed a Motion for Preliminary Determination of Law, arguing that the statute of limitations barred the Brinkmans' claim.[5] After briefing and arguments, the trial court denied the Physician's motion. Consequently, the Physicians filed an interlocutory appeal with this court, resulting in our decision of *Bueter v. Brinkman*, 776 N.E.2d 910 (Ind.Ct.App. 2002), where we concluded that the trial court's denial of the Physician's Motion for a Preliminary Determination of Law did not constitute a final disposition. Accordingly, we held that the statute of limitations defense could be raised again by the Physicians in subsequent proceedings.

Following our decision in 2002, the parties proceeded through the Medical Review Panel process,[6] and on July 16, 2004, the panel issued the following decision, in pertinent part:

> The panel is of the unanimous opinion that the evidence does not support the conclusion that [Dr. Dupler] failed to meet the applicable standard of care. With regard to [Dr. Bueter], the panel is of the unanimous opinion that there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury. The panel also is of the unanimous opinion that the evidence supports the conclusion that [Women's Health Partnership] failed to comply with the appropriate standard of care, and that its conduct was a factor in the resultant damages.

(Appellant's App. p. 18).

On October 4, 2004, the Brinkmans filed a Complaint for Damages, alleging the fol-

---

4. The record indicates that prior to the birth of her daughter in January of 1995, Sandra had one other child.

5. *See* I.C. § 34–18–11–1.

6. *See* I.C. § 34–18–8–4.

lowing negligent acts and omissions by the Physicians: (a) the Physicians failed to identify and treat the prenatal signs of preeclampsia exhibited by Sandra; (b) the Physicians failed to identify and treat the continuing signs of eclampsia exhibited by Sandra after delivery, and negligently discharged her from the hospital on January 27, 1995; (c) the Physicians failed to diagnose and treat the signs of eclampsia reported by Sandra after her discharge from the hospital; and (d) the Physicians failed to appropriately counsel the Brinkmans about the potential risks and complications relating to future pregnancies.

■ On October 25, 2004, the Physicians filed a Motion for Summary Judgment, wherein they argued a second time that the Brinkmans' claim was barred by the statute of limitations. On September 20, 2005, the trial court entered the following Order, in pertinent part: [7]

> IT IS, THEREFORE, ORDERED that there is no just reason for delay in the entry of final judgment and Defendants, [Dr. Bueter, Dr. Dupler, and WHP], are hereby granted summary judgment on all issues in this matter, except as to Allegation [(d)] as it relates to [Dr. Bueter] and [WHP]. As to Allegation [(d)], the Motion for Summary Judgment is denied.

(Appellant's App. p. 9). Thus, only one of the Brinkmans' claims survived summary judgment—whether Dr. Bueter and WHP negligently counseled the Brinkmans as to the risk of eclampsia in future pregnancies.

The Brinkmans now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### APPEAL

The Brinkmans argue that the trial court erred in granting summary judgment in favor of the Physicians on three of the four issues. Specifically, the Brinkmans contend that all of their claims should have survived summary judgment because the two-year statute of limitations for medical malpractice actions in Indiana is unconstitutional as applied to the facts in their case. Additionally, the Brinkmans assert that despite the Medical Review Panel's determination that the evidence is insufficient to show Dr. Dupler's actions fell below the applicable standard of care, other expert medical evidence shows that Dr. Dupler did in fact breach the applicable standard of care in treating Sandra, and such substandard care was a substantial factor in Sandra's injuries and damages.

### I. Standard of Review

■ Summary judgment provides a procedural means to halt litigation when there are no factual disputes and to allow the case to be determined as a matter of law. *Rogers v. Mendel,* 758 N.E.2d 946, 948 (Ind.Ct.App.2001), *trans. denied.* Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). A negligence action is rarely properly disposed of by summary judgment, particularly when the critical ques-

---

7. We note that although Trial Rule 56(C) does not require the trial court to specifically state the legal basis for granting summary judgment, a trial court's findings and conclusions can facilitate appellate review and offer valuable insight into the trial court's rationale for its decision. *AutoXchange. com, Inc. v. Dreyer*

*and Reinbold, Inc.,* 816 N.E.2d 40, 48 (Ind.Ct. App.2004). In the instant case, contrary to our preference that trial courts set forth their reasons for granting summary judgment, the trial court did not issue any findings of fact or conclusions of law. *See id.*

tion for resolution is whether the defendant exercised the requisite degree of care under the circumstances. *Bunch v. Tiwari,* 711 N.E.2d 844, 847 (Ind.Ct.App.1999). This issue is generally a question for the trier of fact, and not answerable as a matter of law. *Id.*

■ In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *AutoXchange.com, Inc. v. Dreyer and Reinbold, Inc.,* 816 N.E.2d 40, 47 (Ind.Ct.App.2004). Thus, on appeal, our duty is to determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* A genuine issue of material fact exists where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *American Family Mut. Ins. Co. v. Hall,* 764 N.E.2d 780, 783 (Ind.Ct.App.2002), *reh'g denied, trans. denied.* The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Palmer v. Gorecki,* 844 N.E.2d 149, 153 (Ind.Ct.App.2006), *reh'g denied.* However, we must carefully assess the trial court's decision to ensure the nonmovant was not improperly denied his or her day in court. *Bunch,* 711 N.E.2d at 848.

■ If the moving party asserts the statute of limitations as an affirmative defense and establishes that the action was commenced outside of the statutory period, the nonmoving party then has the burden of showing an issue of fact material to a theory that avoids the affirmative defense. *Rogers,* 758 N.E.2d at 948–49. In our review, we consider all of the designated evidence in the light most favorable to the nonmoving party. *Hall,* 764 N.E.2d at 783.

## II. *Application of Occurrence–Based Statute of Limitations*

The Brinkmans first argue that Indiana's occurrence-based two-year statute of limitations for medical malpractice actions is unconstitutional as applied to the facts of their case.[8] Although the alleged malpractice occurred in 1995, the Brinkmans contend they did not have enough knowledge to file their lawsuit against the Physicians until Sandra unexpectedly became pregnant in 2000 and sought high-risk obstetrical care from Dr. Zimmer.

Indiana's statutory scheme governing medical malpractice actions contains a statute of limitations, providing:

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect.

I.C. § 34–18–7–1(b). Our supreme court has stated that because this statutory time limit begins to run upon the occurrence of the alleged malpractice, without regard to the date of actual or constructive discovery of injury or malpractice by a person sus-

---

8. We note that while Appellants argue that I.C. § 34–18–7–1 is generally unconstitutional as applied to the facts of their case, they fail to inform this court as to which specific section or sections of the Indiana constitution have been violated. In light of precedent on this issue, we infer that Appellants contend that under the facts of their case, the medical malpractice statute of limitations violates Indiana's Privileges and Immunities Clause, Article 1, § 23, and the Open Courts Law Clause, Article 1, § 12. *See Palmer,* 844 N.E.2d at 154; *see also Booth v. Wiley,* 839 N.E.2d 1168, 1171 (Ind.2005).

taining harm, literal application of the statute can be found unconstitutional in certain situations. *Booth v. Wiley,* 839 N.E.2d 1168, 1170–71 (Ind.2005). Specifically, our supreme court has held that under the Indiana Constitution, Article 1, Sections 12 and 23, the two-year occurrence-grounded statute of limitations may not constitutionally be applied to preclude the filing of a claim before a plaintiff either knows of the malpractice and resulting injury or discovers facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury. *Id.* at 1171. Further, in *Booth,* our supreme court clarified the methodology guiding the application of the medical malpractice statute of limitations as follows:

> Initially, a court must determine the date the alleged malpractice occurred and determine the discovery date—the date when the claimant discovered the alleged malpractice and resulting injury, or possessed enough information that would have led a reasonably diligent person to make such discovery. If the discovery date is more than two years beyond the date the malpractice occurred, the claimant has two years after discovery within which to initiate a malpractice action. But if the discovery date is within two years following the occurrence of the alleged malpractice, the statutory limitation period applies and the action must be initiated before the period expires, unless it is not reasonably possible for the claimant to present the claim in the time remaining
>
> . . .

*Id.* at 1172.

 Therefore, it is now precedent that "persons 'unable to discover the malpractice and their resulting injury within the two-year statutory period may file their claims within two years of the date when they discover the malpractice and the resulting injury or facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury.'" *Id.* at 1171 (quoting *Van Dusen v. Stotts,* 712 N.E.2d 491, 497 (Ind.1999)). Furthermore, our supreme court explained in *Van Dusen* that generally, "[a] plaintiff's lay suspicion that there may have been malpractice is not sufficient to trigger the two-year period," however, "[a]t the same time, a plaintiff need not know with certainty that malpractice caused his injury, to trigger the running of the statutory time period." *Id.* (quoting *Van Dusen,* 712 N.E.2d at 499).

 Additionally, to clarify the standard of proof necessary to establish a plaintiff's date of discovery, our supreme court has provided that when it is undisputed that a physician has expressly informed a plaintiff that he has a specific injury caused by a specific act at a specific time, if not a probability therefore, then the question may be one of law. *Id.* Under such circumstances, a plaintiff is deemed to have sufficient facts to require him to promptly seek any additional medical or legal advice needed to resolve any uncertainty or confusion he or she may have regarding the injury and its cause, and thus should not be excused for failing to timely file a claim. Therefore, the date on which a potential plaintiff receives information that there is a reasonable probability that a specific injury was caused by a specific act at a specific time is the date upon which the two-year statute of limitations begins to run. *Id.*

In the present case, the Brinkmans assert they did not discover there was a reasonable probability that Dr. Bueter, Dr. Dupler, and WHP caused a specific injury to Sandra in their provision of obstetrical and post-delivery care in 1995 until meeting with Dr. Zimmer on January 31, 2000.

Conversely, although it is undisputed that the Brinkmans did not have actual knowledge of the malpractice until January of 2000, the Physicians argue that Sandra received sufficient information to discover that an act of malpractice occurred when she was accurately diagnosed with eclampsia on January 30, 1995; in other words, according to the Physicians' argument, being diagnosed with eclampsia is sufficient to signal that a diagnosis of preeclampsia was missed. As a result, the Physicians contend that January 30, 1995 is the "discovery date" that began the running of the statute of limitations.

In our determination of the discovery date, we construe all facts in favor of the Brinkmans as nonmovants. *See Palmer,* 844 N.E.2d at 154. First, as directed by *Booth,* we determine the date, or dates in this case, the alleged malpractice occurred. Here, as previously noted, the Brinkmans urge that four separate instances of malpractice occurred: (a) the Physicians' failure to diagnose and treat preeclampsia; (b) the Physicians' failure to diagnose and treat eclampsia during Sandra's hospitalization from January 22 to January 26, 1995 and their negligence in discharging her on January 27, 1995; (c) WHP's negligent follow-up care upon telephone calls by the Brinkmans to the Physicians' practice over the weekend of January 28, 1995; and (d) Dr. Bueter's negligent counseling given to the Brinkmans during their final office visit at WHP on March 10, 1995. Thus, the "occurrence" date(s) for the alleged acts of malpractice are confined to January and March of 1995. Consequently, strict adherence to the occurrence-based method of the statute of limitations would put the Brinkmans' claim, filed in December of 2000, nearly four years beyond the expiration of the two-year time period.

■ However, if the determination relies strictly on the date the Brinkmans were made directly aware of their possible malpractice claim—January 31, 2000—their filing of the claim in December of 2000 falls well within the statutory time period. Nevertheless, as *Booth* noted, the discovery date does not solely depend upon when a claimant discovers the malpractice, but also depends upon when a claimant has enough information that through reasonable diligence, discovery of the alleged malpractice can be made. *See Palmer,* 844 N.E.2d at 154.

From our evaluation of the record, we conclude that the Brinkmans' ability to discover information supporting a malpractice claim prior to meeting with Dr. Zimmer in January of 2000 is impracticable. In particular, our review of Sandra's deposition indicates she and Mark trusted the Physicians' care through her episode of eclampsia, and were unaware that the condition was a result of untreated preeclampsia. Furthermore, both Sandra's and Mark's depositions indicate they placed a significant amount of confidence in Dr. Bueter's recommendation that Sandra have no additional children. Moreover, we find contradiction within the Physicians' assertion that the Brinkmans were made aware of the failure to diagnose preeclampsia when Sandra was diagnosed with eclampsia because such an assertion is inconsistent with Dr. Bueter's testimony from her deposition wherein she states that the discharge notes upon Sandra's release from the hospital on February 4, 2005 never reference preeclampsia. Thus, there is no evidence in the record to support a conclusion that Dr. Bueter discussed preeclampsia with the Brinkmans during Sandra's hospitalization.

Additionally, we fail to find any evidence that Dr. Bueter discussed preeclampsia with the Brinkmans during Sandra's post-delivery and post-hospitalization office visits. Also, following these office visits, we

note that Sandra did not experience any symptoms that would have put her on notice that a malpractice had occurred. *See Martin v. Richey,* 711 N.E.2d 1273 (Ind.1999); *see also Van Dusen,* 712 N.E.2d 491; *Battema v. Booth,* 853 N.E.2d 1014 (Ind.Ct.App., 2006). Therefore, as the Brinkmans point out, the Physicians' argument essentially requires the Brinkmans, as laypersons, to automatically know that eclampsia is preceded by preeclampsia. Consequently, viewed in the light most favorable to the Brinkmans, we conclude that the occurrence-based statute of limitations is unconstitutional as applied to the facts in this case because the Brinkmans did not have enough information to discover the malpractice until January 2000. *See Booth,* 839 N.E.2d at 1171.

Nonetheless, the Physicians argue that even if the Brinkmans did not have enough knowledge prior to January of 2000 to file their claim, the claim is still time-barred because an "omission cannot as a matter of law extend beyond the time the physician last rendered a diagnosis." (Appellees' Brief p. 11) (quoting *Havens v. Ritchey,* 582 N.E.2d 792, 795 (Ind.1991)). In *Havens,* the defendant, a physician, performed surgery on the plaintiff in November of 1984, and never saw the plaintiff, patient, again. *Havens,* 582 N.E.2d at 793. The plaintiff was made aware of a potential malpractice upon seeing another physician in October of 1985. *Id.* Determining that the plaintiff's claim, filed in October of 1987, was outside the statute of limitations, our supreme court held:

> [A] physician cannot be under a continuing duty to review all files daily to ensure that he did not misdiagnose a condition of a patient he may not have seen for several months or even years. This duty would be completely overwhelming to health care providers, and cut against the purposes of the Medical Malpractice Act. We hold that when the

sole claim of medical malpractice is a failure to diagnose, the omission cannot as a matter of law extend beyond the time the physician last rendered a diagnosis.

*Palmer,* 844 N.E.2d at 156 (quoting *Havens,* 582 N.E.2d at 795).

In the instant case, three of the four claims brought by the Brinkmans involve a failure to diagnose either preeclampsia or eclampsia. Also, the record discloses that Sandra was last given a diagnosis by the Physicians on January 30, 1995, yet did not file her malpractice claim until December 2000. Looking at these facts in isolation, *Havens* would seemingly apply to bar the Brinkmans' three claims as to the Physicians' failures to diagnose preeclampsia and eclampsia. However, we cannot ignore primary differences between the facts in *Havens* and the facts here. Unlike the patient in *Havens* who never saw the physician again following the injury, Sandra visited Dr. Bueter more than once following her hospitalization for eclampsia. During these office visits with Sandra, there is no evidence Dr. Bueter conferred her knowledge of the typical progression of preeclampsia to eclampsia to Sandra or her husband.

Additionally, we do not believe the facts before us imposed any continuing duty on Dr. Bueter or any of the Physicians to review Sandra's file. Rather, the Physicians were aware of their failure to diagnose preeclampsia at the time Sandra was admitted for eclampsia, and had the opportunity to review her records during the hospitalization and afterward during subsequent office visits. Finally, the record makes it clear that the Brinkmans filed their claim less than eleven months after meeting with Dr. Zimmer, whereas the patient in *Havens* waited two years after the time of discovery to file a claim.

Therefore, we find *Havens* inapplicable under this set of facts and adhere to our earlier conclusion that the occurrence-based statute of limitations is unconstitutional as applied to the Brinkmans.

### III. *Dr. Dupler*

■ The Brinkmans also argue that the trial court improperly granted summary judgment as to all claims pertaining to Dr. Dupler. Specifically, the Brinkmans allege that summary judgment was inappropriate as to Dr. Dupler because a genuine issue of material fact exists as to whether he breached the applicable standard of care in treating Sandra.

■ In the Brinkmans' case, a unanimous medical review panel determined the evidence did not support the conclusion that Dr. Dupler failed to meet the applicable standard of care in treating Sandra. When a medical review panel renders an opinion in favor of the physician, the plaintiff must then come forward with expert medical testimony to rebut the panel's opinion in order to survive summary judgment. *Bunch,* 711 N.E.2d at 850. Accordingly, the Brinkmans designated as evidence in their opposition to the Physicians' motion for summary judgment the affidavit of Kathryn Cashner, M.D. (Dr. Cashner), an obstetrician / gynecologist, who stated, in pertinent part:

5. It is my opinion that during his care of [Sandra], [Dr. Dupler] fell below the appropriate standard of care for a obstetrician in Indiana practicing obstetrics and gynecology in 1995.

6. [Dr. Dupler] saw [Sandra] on January 19, 1995 for a prenatal office visit. At that time, [Sandra] had a 3.8 pound weight gain, blood pressure of 138/90 and urine positive for 2+ protein, all possible signs of early pre[ ]eclampsia.

7. On Sunday, January 22, 1995, Sandra presented to St. Vincent Hospital with complaints of headache for the past three days. She was seen by [Dr. Dupler] who admitted her for evaluation of her headache. Despite elevated blood pressure, slight edema of hands and ankles, slight proteinuria, headache, epigastric pain, and visual changes, Dr. Dupler concluded "no pre-eclamptic signs or symptoms."

8. It is my opinion that Dr. Dupler fell below the standard of care during his care and treatment of [Sandra], including but not limited to the following: his failure to recognize the pre[-]eclamptic signs and symptoms exhibited by [Sandra] at the time of her admission on January 22, 1995; his failure to order daily weights for [Sandra] during her hospitalization; his failure to appropriately evaluate [Sandra's] condition on January 27, [1995,] which [led] to his decision to discharge her from the hospital despite documented high blood pressures and the recommendation by the neurologist, Dr. Wong, to continue her hospitalization until her blood pressure was normal; and his failure to communicate with his partners and office staff that "strict instructions to call should her headache redevelop or neurological signs or symptoms appear" were given to [Sandra].

9. It is my opinion that Dr. Dupler's breach of the standard of care for an obstetrician/gynecologist in 1995 in Indianapolis, Indiana, as set forth herein, was a substantial factor in [Sandra's] resulting injury and damages, including the progression of her condition to eclampsia and grand mal seizures.

(Appellant's App. pp. 80–81).

Thus, following the medical review panel's decision, the burden of proof shifted to the Brinkmans to respond by designating evidentiary matter to demonstrate that a genuine issue of fact existed regarding the

standard of care issue. *See id.* We conclude that the Brinkmans satisfied this burden of proof by submitting the affidavit of Dr. Cashner, which provides sufficient evidence to refute the medical review panel's opinion and create a genuine issue of material fact. *See id.* Accordingly, we conclude that the trial court erred in granting summary judgment in favor of Dr. Dupler on all claims applicable to him.

### CROSS–APPEAL

#### I. *Negligent Counseling by Dr. Bueter*

On cross-appeal, the Physicians contend that the trial court erred in denying summary judgment as to the claim that Dr. Bueter negligently counseled the Brinkmans at Sandra's post-partum appointment on March 10, 1995. Specifically, the Physicians argue the claim is time-barred, and that the logic of the argument is flawed in that the Brinkmans assert Dr. Bueter's counseling was both intentional and negligent.

Due to our conclusion that the occurrence-based statute of limitations is unconstitutional here because the Brinkmans lacked the knowledge or ability to discover the alleged malpractice until January 2000, we disagree with the Physicians' proposition that the negligent counseling claim against Dr. Bueter is time-barred. Just as the Brinkmans did not have enough knowledge prior to January 2000 to discover the Physicians' failure to diagnose preeclampsia, they also could not have had sufficient information before that time to know that Dr. Bueter ill-advised them on the dangers of future pregnancies. *See Booth,* 839 N.E.2d at 1171. Also, while we agree with the Physicians that conduct cannot be both negligent and willful, we must view the facts in the light most favorable to the Brinkmans. *See Hall,* 764 N.E.2d at 783. In doing so, we note that both the medical review panel and the trial court concluded that the negligent counseling claim against Dr. Bueter should stand. Also, considering we fail to find any independent evidence put forth by the Physicians that would persuade us to part from the previous decision of the medical review panel and the trial court, we decline to reverse summary judgment on this claim.

### CONCLUSION

Based on the foregoing, we conclude: (1) the statute of limitations under the Medical Malpractice Act is unconstitutional as applied to the Brinkmans' case; (2) the trial court improperly entered summary judgment in favor of Dr. Dupler on all claims applicable to his care of Sandra; and (3) the trial court properly denied summary judgment as to the negligent counseling claim against Dr. Bueter.

Affirmed in part, reversed in part, and remanded.

DARDEN, J., concurs.

VAIDIK, J., dissents with separate opinion.

VAIDIK, Judge, dissenting.

I respectfully dissent from the majority's conclusion that the trial court erred in granting summary judgment in favor of the Physicians on three of the four issues raised in the Brinkmans' complaint. Specifically, I do not believe that Indiana's occurrence-based two-year statute of limitations for medical malpractice actions is unconstitutional as applied to the Brinkmans. Rather, I believe that the Brinkmans possessed enough information that would have led a reasonably diligent person to discover the alleged malpractice and resulting injury within two years following the occurrence of the alleged malpractice. Therefore, I would affirm the trial court's grant of summary judgment in favor of the

Physicians on these issues. I also respectfully dissent from the majority's conclusion that the trial court properly denied summary judgment on the fourth issue raised in the Brinkmans' complaint. Specifically, I believe that the Brinkmans have not established that the Physicians concealed material information that somehow prevented them from inquiring into or investigating Sandra's condition, thus preventing them from discovering a potential cause of action. Therefore, I would reverse the trial court's denial of summary judgment on this issue.

In their complaint, the Brinkmans alleged that the Physicians committed malpractice by failing to diagnose and treat Sandra's pre-eclampsia and eclampsia. These events all occurred in January 1995. However, the Brinkmans did not file their complaint against the Physicians until December 2000. The Brinkmans argue that they did not discover there was a reasonable probability that the Physicians caused a specific injury to Sandra in their provision of care in 1995 until meeting with another doctor in January 2000, who advised the Brinkmans that Sandra's medical records showed that she had symptoms of pre-eclampsia prior to giving birth in 1995 and that if she had received proper care for pre-eclampsia, it would not have progressed into toxic eclampsia. The Physicians respond that the Brinkmans possessed sufficient information to discover that an act of malpractice occurred when Sandra was accurately diagnosed with eclampsia on January 30, 1995. As such, the Physicians assert that January 30, 1995, is the date that the statute of limitations began to run.

It is undisputed that "a plaintiff need not know with certainty that malpractice caused his injury, to trigger the running of the statutory time period." *Booth v. Wiley*, 839 N.E.2d 1168, 1171 (Ind.2005) (quo-

tation omitted). Our Supreme Court has provided the following guidance for determining when the statutory time period begins to run:

> Initially, a court must determine the date the alleged malpractice occurred and determine the discovery date-the date when the claimant discovered the alleged malpractice and resulting injury, or *possessed enough information that would have led a reasonably diligent person to make such discovery.* If the discovery date is more than two years beyond the date the malpractice occurred, the claimant has two years after discovery within which to initiate a malpractice action. But if the discovery date is within two years following the occurrence of the alleged malpractice, the statutory limitation period applies and the action must be initiated before the period expires, unless it is not reasonably possible for the claimant to present the claim in the time remaining after discovery and before the end of the statutory period.

*Id.* at 1172 (emphasis added).

The majority concludes that the Brinkmans' ability to discover information supporting a malpractice claim prior to meeting with the doctor in 2000 is "impracticable." Slip op. at 14. I disagree. On January 22, 1995, Sandra, eight months pregnant, was hospitalized with complaints of a severe headache that had persisted for a few days, gastric pain, and vomiting. Her blood pressure was high and her urine contained trace protein. Sandra, still hospitalized, gave birth on January 26, 1995. On January 27, 1995, Sandra was released from the hospital with high blood pressure despite a neurologist's advice that she remain in the hospital until her blood pressure stabilized. After being released from the hospital, Sandra again experienced a se-

vere headache and contacted the Physicians. Because Sandra was no longer an obstetrical patient, Sandra was referred to a family physician, and that doctor treated her for pain and nausea on January 30, 1995, and sent her home. Later that afternoon, Sandra experienced a grand mal seizure and was taken by ambulance to the hospital, where she experienced another seizure. She was admitted to the hospital with a diagnosis of toxic eclampsia. Sandra remained in the hospital under treatment for eclampsia until February 4, 1995.

I believe that the discovery date—the date when the claimant discovered the alleged malpractice and resulting injury or *possessed enough information that would have led a reasonably diligent person to make such discovery*—is January 30, 1995, the date Sandra was accurately diagnosed with eclampsia. The Brinkmans possessed enough information on that date to let them know that Sandra had a severe complication that had been negligently left untreated until she experienced two grand mal seizures and finally received a proper diagnosis of eclampsia. This case is wholly unlike the Supreme Court's cases in *Martin v. Richey*, 711 N.E.2d 1273 (Ind. 1999), and *Van Dusen v. Stotts*, 712 N.E.2d 491 (Ind.1999), where the plaintiffs suffered from latent diseases and did not have any symptoms that would have put them on notice that malpractice might have occurred.[9] *See Battema v. Booth*, 853 N.E.2d 1014, 1019 (Ind.Ct.App.2006), *trans. pending*. Despite Sandra's symptoms and efforts to let the Physicians

know that something was wrong with her, Sandra was released from the hospital only then to suffer two grand mal seizures. Based on these facts, I conclude that the Brinkmans possessed enough information within two years after Sandra's diagnosis of eclampsia on January 30, 1995, to lead a reasonably diligent person to conclude that malpractice had occurred. Therefore, I would affirm the trial court on the issues related to the Physicians' failure to diagnose and treat Sandra's pre-eclampsia and eclampsia.

In their complaint, G to appropriately counsel them about the potential risks and complications relating to future pregnancies at Sandra's post-partum appointment on March 10, 1995, with Dr. Bueter.[10] Specifically, the Brinkmans argue that the Physicians engaged in active, fraudulent concealment at this appointment, thereby tolling the statute of limitations. At Sandra's post-partum appointment, Dr. Bueter discussed Sandra's eclampsia with the Brinkmans. Dr. Bueter also told the Brinkmans that while she was hospitalized before giving birth, the Physicians had been checking her for signs and symptoms of pre-eclampsia but she did not appear to have any. Nevertheless, the Brinkmans assert that Dr. Bueter then told them things, such as not to have any more children, "to ensure that [they] would never learn about the malpractice." Appellants' Br. p. 28. However, this assertion ignores the fact that Sandra, who had symptoms of a severe complication, was sent home from the hospital and experienced two grand

---

9. In their brief, the Brinkmans rely on *Booth v. Wiley*. However, that case is distinguishable from the present case because Booth had cataracts and glaucoma before the LASIK surgery and factual questions existed as to whether the doctor attributed Booth's symptoms to causes unrelated to the LASIK surgery. *See Booth*, 839 N.E.2d at 1175. These facts are not present here.

10. In its summary judgment order, the trial court denied summary judgment on this issue as it related to Dr. Bueter and WHP. The trial court presumably granted summary judgment on this issue in favor of Dr. Dupler because he was not present at Sandra's March 10, 1995, post-partum appointment.

mal seizures, at which point she was accurately diagnosed with eclampsia. To successfully invoke the doctrine of fraudulent concealment, the Brinkmans must establish that Dr. Bueter's concealment of material information somehow prevented them from inquiring into or investigating Sandra's condition, thus preventing them from discovering a potential cause of action. *See Garneau v. Bush*, 838 N.E.2d 1134, 1143 (Ind.Ct.App.2005), *trans. denied.* Here, because it is undisputed that Sandra was accurately diagnosed with eclampsia, the record lacks such uncontroverted evidence. Accordingly, I believe that the doctrine of fraudulent concealment does not operate to toll the statute of limitations. Accordingly, the statute of limitation on any claim arising from the postpartum appointment on March 10, 1995, began to run on that date, which is also the date that the physician-patient relationship ended. And because the Brinkmans filed their complaint in December 2000, like the claims above, such a claim is time-barred. Therefore, I would reverse the trial court on this issue and enter summary judgment in favor of Dr. Bueter and WHP.