ATTORNEYS FOR APPELLANTS
Rex E. Baker
Caroline A. Gilchrist
Avon, Indiana

ATTORNEYS FOR APPELLEES
Mary H. Watts
Nana Quay-Smith
Kelly R. Eskew
Indianapolis, Indiana

# In the
# Indiana Supreme Court

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 29S02-0704-CV-141

SANDRA AND MARK BRINKMAN,

*Appellants (Plaintiffs Below),*

v.

ANNE P. BUETER, M.D.,
JAMES F. DUPLER, M.D., AND
WOMEN'S HEALTH PARTNERSHIP, P.C.,

*Appellees (Defendants Below).*

Appeal from the Hamilton Superior Court, No. 29D01-0410-CT-872
The Honorable Steven David, Special Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 29A02-0510-CV-980

**January 15, 2008**

**Shepard, Chief Justice.**

Patients waited until 2000 to file their medical malpractice complaint even though all underlying events occurred in 1995. Nothing prevented them from filing a complaint within the statutory period, and the defendant medical providers are thus entitled to summary judgment under Indiana's Medical Malpractice Act.

**Facts and Procedural History**

Sandra Brinkman learned she was pregnant in May 1994, and she was due to deliver in February 1995. Dr. Anne Bueter was her primary obstetrician, but all of the physicians at Women's Health Partnership, P.C. ("WHP") saw Mrs. Brinkman during her pregnancy.

Dr. James Dupler saw Mrs. Brinkman on January 19, 1995, at 38 weeks, and noted that her urine was positive for two plus protein, that she had increased blood pressure, and that she had gained 2.8 pounds in one week. He instructed her to come back in three days instead of a week, possibly considering a diagnosis of preeclampsia.[1]

Three days later, on January 22, 1995, Mrs. Brinkman was admitted to St. Vincent Hospital. She complained of severe headaches, "unlike any headache in the past," spots in front of her eyes, epigastric pain, and vomiting. (App. at 41-42.) The admitting nurse also found slight swelling in Mrs. Brinkman's hands and ankles. Dr. Dupler was on-call, and he documented Mrs. Brinkman's increased blood pressure and trace protein, but found no swelling, no neurological signs, no photophobia, and no visual changes. He concluded she displayed "no preEclamptic signs or symptoms." (Id. at 42.)

Because Dr. Dupler could not identify the etiology of the headaches, he ordered a neurological exam by Dr. Wesley Wong, but the exam did not produce any explanation for the headaches. Dr. Wong also ruled out preeclampsia.

---

[1] Preeclampsia, a condition pregnant women are susceptible to, is marked by three important signs: hypertension (high blood pressure), edema (fluid retention), and proteinuria (protein in the urine).

> These tend to develop without outward signs or warnings, making early and regular prenatal care important to early detection. If symptoms have developed—headache, visual disturbances, epigastric pain—the condition may be in an advanced state. Prenatal visits should include a blood pressure measurement, evaluation of weight gain (about one pound per week is normal; more than two pounds per week or six pounds per month is reason to suspect incipient preeclampsia), urinalysis for protein, and questions about the presence of headaches, pain or visual problems.

Preeclampsia, when present, develops after the twentieth week of pregnancy. Russ et. al., Attorneys Medical Advisor § 14:58-14:59, Binder 1 (Thomson/West 2005).

Mrs. Brinkman delivered a healthy baby girl without complication on January 26, 1995. Her headaches improved after delivery. She subsequently developed neck pain on January 27, but Doctors Dupler and Wong agreed that it was likely musculoskeletal in origin.[2] That same evening, Mrs. Brinkman's neck pain improved, and she "strongly desired to be discharged from the hospital." (App. at 50.) She was discharged on Friday, January 27 with "strict instructions to call should her headache redevelop or [should] she begin[] having neurological signs or symptoms." (Id. at 50-51.)

Over the January 28-29 weekend, Mr. Brinkman called WHP both days to report that his wife's headache had redeveloped. WHP advised that the headache was likely a "sinus headache" and recommended Tylenol and Sudafed. On Monday, January 30, 1995, Mr. Brinkman again called WHP to report that she had nausea and vomiting in addition to the headache and that Tylenol and Sudafed had not provided any relief. A nurse called back to say she had spoken with a doctor and it was likely a virus or sinus problem. She recommended that Mrs. Brinkman see a family doctor and referred the Brinkmans to Dr. Steven Lang, who Mrs. Brinkman saw the same day.

Dr. Lang prescribed medications for pain and nausea, and Mr. Brinkman dropped his wife off at home while he went to fill her prescriptions. When he returned, he found Mrs. Brinkman in bed having a seizure. She was rushed to the hospital by ambulance. Mrs. Brinkman had another seizure in the emergency room, and her blood pressure was 220/120. During this second hospital stay, Mrs. Brinkman was diagnosed with eclampsia and successfully treated for it.[3]

On March 10, 1995, the Brinkmans went to see Dr. Bueter for Mrs. Brinkman's post-partum exam. Dr. Bueter discussed preeclampsia and eclampsia with the Brinkmans and

---

[2] Aside from her neck pain, Dr. Wong also expressed concern on January 27, 1995, about Mrs. Brinkman's elevated blood pressure of 153/106. He noted that he would keep Mrs. Brinkman hospitalized until her blood pressure stabilized and her neck pain was resolved. (App. at 45.)

[3] "If preeclampsia is not treated, it may evolve into a more serious condition called 'eclampsia,' characterized by convulsions. This condition is one of the most dangerous in obstetrical practice. . . . Several convulsions may follow the first, with coma usually following the series of convulsions." Russ et. al., Attorneys Medical Advisor § 14:60, Binder 1 (Thomson/West 2005).

explained that Mrs. Brinkman had an atypical case in that she did not show signs of preeclampsia until four days after delivery. (Appellants' Br. at 12.) She also counseled that any future pregnancy would be high risk, putting Mrs. Brinkman's life in danger, and discussed sterilization options with the Brinkmans. (App. at 36-37.)

The Brinkmans wanted more children, but they feared for Mrs. Brinkman's life. Although they chose not to proceed with sterilization, they used birth control. In January 2000, Mrs. Brinkman accidentally became pregnant. She first called WHP to speak with Dr. Bueter, but she no longer worked for WHP. After reviewing her chart, WHP advised Mrs. Brinkman to seek high-risk obstetrical care.

The Brinkmans met with Dr. Dawn Zimmer on January 31, 2000. At this appointment, Dr. Zimmer told them:

1. Sandy had symptoms of preeclampsia that had not received proper care in the proper time by Dr. Bueter, Dr. Dupler and Women's Health Partnership, which then progressed to a life threatening situation.

2. The information given by Dr. Bueter was not correct and that there are numerous ways to treat preeclampsia and prevent preeclampsia from developing into eclampsia with seizure.

3. Furthermore, Dr. Bueter's advice to get sterilized due to the risk to Sandy and risks relating to future pregnancies was incorrect. The risk of preeclampsia does not increase in subsequent pregnancies with the same father, preeclampsia does not always occur in the subsequent pregnancy and if it does, it can be treated.

(Id.; see also App. at 37.)

Based on this information, the Brinkmans filed a medical malpractice complaint with the Indiana Department of Insurance on December 7, 2000. Despite defendants' argument that any proposed claim was barred by the statute of limitations, the parties proceeded through the medical review panel process.[4] The panel issued its decision on July 16, 2004,[5] and the

---

[4] Defendants sought a preliminary determination of law that the claims were barred by the statute of limitations. Defendants' motion was denied, and they appealed. The Court of Appeals held in Bueter v. Brinkman, 776 N.E.2d 910, 913 (Ind. Ct. App. 2002), that the order denying the preliminary

Brinkmans filed their complaint with the Hamilton Superior Court on October 4, 2004, alleging Dr. Bueter, Dr. Dupler, and WHP committed the following negligent acts and/or omissions:

   a.   The Defendants failed to identify and treat the prenatal signs of preeclampsia exhibited by the Plaintiff, Sandra Brinkman;

   b.   The Defendants failed to identify and treat the continuing signs of eclampsia exhibited by the Plaintiff, Sandra Brinkman after delivery and negligently discharged her from the hospital on January 27, 1995;

   c.   The Defendants failed to diagnose and treat the signs of eclampsia reported by the Plaintiff, Sandra Brinkman after her discharge from the hospital; and

   d.   The Defendants failed to appropriately counsel the Plaintiffs, Sandra Brinkman and Mark Brinkman about the potential risks and complications relating to future pregnancies.

(Id. at 22-23.)

The defendants moved for summary judgment, arguing that the claims were barred by the statute of limitations. The trial court granted defendants summary judgment on all issues except whether Dr. Bueter and WHP negligently counseled the Brinkmans as to the risk of eclampsia in future pregnancies. Both parties appealed, and a divided Court of Appeals reversed the grant of summary judgment to the defendants, concluding the medical malpractice statute was unconstitutional as applied to the Brinkmans. It affirmed the denial of summary judgment on the issue of negligent counseling. Brinkman v. Bueter, 856 N.E.2d 1231, 1242 (Ind. Ct. App. 2006). We granted transfer.

---

determination of law was not a final judgment, and defendants could raise the statute of limitations as an affirmative defense after the panel reached its decision.

[5] The panel opinion read:

> The panel is of the unanimous opinion that the evidence does not support the conclusion that James F. Dupler, M.D. failed to meet the applicable standard of care. With regard to defendant, Anne P. Bueter, M.D., the panel is of the unanimous opinion that there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury. The panel also is of the unanimous opinion that the evidence supports the conclusion that defendant, Women's Health Partnership, failed to comply with the appropriate standard of care, and that its conduct was a factor of the resultant damages.

(App. at 18.)

5

# I.       Statute of Limitations

The statute of limitations for medical malpractice claimants provides:

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect . . . .

Ind. Code Ann. § 34-18-7-1(b) (West 2007).  This is an "occurrence" statute as opposed to a "discovery" statute.  The time therefore begins to run on the date the alleged negligent act occurred, not on the date it was discovered.  Martin v. Richey, 711 N.E.2d 1273, 1278 (Ind. 1999) (citing Cacdac v. Hiland, 561 N.E.2d 758 (Ind. 1990)).

We have upheld the facial constitutionality of this statute multiple times,[6] but we have also held that it may be unconstitutional as applied to a particular plaintiff.  In Martin, for example, the asserted negligence was a physician's failure to diagnose and treat plaintiff's breast cancer.  All of the physician's alleged negligent acts occurred in 1991, but the plaintiff did not discover that she had breast cancer until 1994.  Thus, while the plaintiff did not file the claim within the two-year statutory period, we concluded the statute of limitations was unconstitutional as applied, under the Privileges and Immunities Clause and the Open Courts Clause of the Indiana Constitution, saying:

> We find the statute of limitations *as applied* to the plaintiff in this case is unconstitutional under [the Privileges and Immunities Clause] because it is not "uniformly applicable" to all medical malpractice victims . . . .  Simply put, the statute precludes [plaintiff] from pursuing a claim against her doctor because she has a disease which has a long latency period and which may not manifest significant pain or symptoms until several years after the asserted malpractice. The statute of limitations is also unconstitutional under [the Open Courts Clause] because it requires plaintiff to file a claim before she is able to discover the alleged malpractice and her resulting injury, and therefore, it imposes an impossible condition on her access to the courts and pursuit of her tort remedy.

Id. at 1279.

---

[6] See Martin, 711 N.E.2d at 1279 (citing Rohrabaugh v. Wagoner, 274 Ind. 661, 413 N.E.2d 891 (1980); Johnson v. St. Vincent Hosp., Inc., 273 Ind. 374, 404 N.E.2d 585 (1980)).

In the companion case of <u>Van Dusen v. Stotts</u>, 712 N.E.2d 491 (Ind. 1999), the plaintiff alleged his physicians failed to timely diagnose and treat his prostate cancer. Stotts first sought medical advice in 1992. Although his physician found a small tumor and performed a biopsy, plaintiff was told the tissue was benign. It was not until Thanksgiving of 1994, more than two years after the biopsy, that Stotts experienced any further symptoms. Stotts was subsequently diagnosed with prostate cancer in 1995. Tailoring a narrow exception based on the plaintiffs in <u>Martin</u> and <u>Van Dusen</u>, we said,

> We construe section 34-18-7-1(b) to permit plaintiffs like Martin and the Stottses — that is, plaintiffs who, *because they suffer from cancer or other similar diseases or medical conditions with long latency periods are unable to discover the malpractice and their resulting injury within the two-year statutory period* — to file their claims within two years of the date when they discover the malpractice and the resulting injury or facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice . . . .

<u>Id.</u> at 497 (emphasis added).

For plaintiffs like those in <u>Martin</u> and <u>Van Dusen</u>, the statutory period does not begin to run until either the correct diagnosis is made or the patient has sufficient facts to make it *possible* to discover the alleged injury. <u>See Martin</u>, 711 N.E.2d at 1284-85 (plaintiff unable to claim failure to diagnose cancer before plaintiff discovered she in fact had a malignancy); <u>Van Dusen</u>, 712 N.E.2d at 495 (two-year period triggered on failure to diagnose claim when physician told Stotts he had incurable cancer). As we said in <u>Martin</u>, to hold otherwise "would impose an impossible condition on [Martin's] access to the courts and pursuit of a tort remedy. . . . [I]t would require her to file a claim before such claim existed." 711 N.E.2d at 1285.

As Justice Selby wrote in <u>Martin</u>, we defer to the legislature's judgment in enacting an occurrence statute and recognize the "legitimate legislative goal of maintaining sufficient medical treatment and controlling medical malpractice insurance costs." <u>Id.</u> at 1280. Thus, the statutory period runs from the date of the occurrence of the alleged negligent act, except in those limited situations where it is impossible for plaintiffs to discover the alleged malpractice.

7

## II.     Application of "Occurrence" Statute

Three of the Brinkmans' four claims concern an alleged failure to diagnose and treat either preeclampsia or eclampsia. The fourth claim concerns the post-partum counseling the Brinkmans received on March 10, 1995.

Although Mrs. Brinkman was correctly diagnosed with and treated for eclampsia upon her January 30, 1995, admission to the hospital, she did not file a complaint until December 2000. Because the alleged malpractice occurred in 1995, the complaint obviously fell outside the two-year statutory period.

Likening their case to the plaintiffs in Martin and Van Dusen, the Brinkmans argue that the statute is unconstitutional as applied to them. (Appellants' Br. at 19, 23-27.) Unlike the plaintiffs in Martin and Van Dusen, however, Mrs. Brinkman did not suffer from a disease or medical condition with a long latency period. When a physician fails to diagnose cancer, the patient may continue without symptoms for years. It is impossible for these patients to claim failure to diagnose cancer before they know they are suffering from the disease. The Brinkmans did not face this challenge. Instead, Mrs. Brinkman suffered eclamptic seizures on January 30, 1995, and was immediately diagnosed with and treated for eclampsia.[7] All of these events occurred in 1995, and nothing prevented the Brinkmans from bringing a claim about faulty diagnosis or treatment within the two-year statutory period. The statute of limitations on the Brinkmans' failure to diagnose and treat claims thus began to run in 1995 and expired in 1997. The trial court was correct to grant summary judgment to defendants on these claims.

---

[7] The Court of Appeals emphasized the distinction between preeclampsia and eclampsia, emphasizing that Mrs. Brinkman was never diagnosed with preeclampsia. Brinkman, 856 N.E.2d at 1238-39. This distinction is irrelevant for two reasons. First, Dr. Bueter discussed both preeclampsia and eclampsia with the Brinkmans at the post-partum exam in 1995. (Appellants' Br. at 12.) Second, preeclampsia is simply a precursor to eclampsia. See Russ et. Al., Attorneys Medical Advisor § 14:60, Binder 1 (Thomson/West 2005) ("If preeclampsia is not treated it may evolve into a more serious condition called 'eclampsia.'"); see also Stedman's Medical Dictionary 609 (28th ed., Lippincott Williams & Wilkins 2006) (defining eclampsia as "Occurrence of one or more convulsions, not attributable to other cerebral conditions such as epilepsy or cerebral hemorrhage, in a patient with preeclampsia."). The diagnosis of eclampsia thus triggered the statute of limitations for the failure to diagnose preeclampsia claim.

The Brinkmans similarly argue that they did not have sufficient facts to support their negligent counseling claim until 2000, when Dr. Zimmer contradicted some of the advice given to them at the 1995 post-partum exam. This argument lacks merit. A plaintiff does not need to be told malpractice occurred to trigger the statute of limitations. Van Dusen, 712 N.E.2d at 499. The Brinkmans were equipped with a correct diagnosis in 1995, and the alleged negligent counseling occurred in 1995. Nothing prevented the Brinkmans from seeking further medical or legal advice. Thus, the two-year statute of limitations also bars this claim.

**Conclusion**

We affirm the trial court's grant of summary judgment to the defendants and direct entry of judgment on the counseling claim.

Dickson, Sullivan, Boehm, and Rucker, JJ., concur.